EDOK Criminal Complaint (Revised 6/13)

# United States District Court

## EASTERN DISTRICT OF OKLAHOMA

FILED

JAN 2 5 2016

PATRICK KEANEY
Clerk, U.S. District Court

By_____
Deputy Clerk

UNITED STATESA OF AMERICA,

*Plaintiff,*

v.

CODY McCLENDON, MICHAEL LINCOLN,
AMBER CLAPHAN, DONALD TRAMMEL,
SAMANTHA SMITH, TERESA CHAGOLLA,
JACOB MASTERS and NATHAN GREEN,

*Defendants.*

**CRIMINAL COMPLAINT**

Case No. MJ - 16 - 003 - KEW

I, John Morrison, the undersigned complainant, state that the following is true to the best of my knowledge and belief.

From in or about June 2015 and continuing up to and including the time of this Complaint, in the Eastern District of Oklahoma, **CODY McCLENDON, MICHAEL LINCOLN, AMBER CLAPHAN, DONALD TRAMMEL, SAMANTHA SMITH, TERESA CHAGOLLA, JACOB MASTERS** and **NATHAN GREEN,** defendants herein, did willfully and knowingly combine, conspire, confederate and agree together and with other persons known and unknown to commit offenses against the United States in violation of Title 21, United States Code, Section 846, to wit: Possession with Intent to Distribute and the Distribution of 500 grams or more of a mixture or substance containing a detectable amount of Methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

I further state that I am an Agent with the Oklahoma Bureau of Narcotics and Dangerous Drugs, and that this complaint is based on the following facts: See attached Affidavit of OBNDD Agent John Morrison which is attached hereto and made a part hereof by reference.

☒    Continued on the attached sheet.

JOHN MORRISON, Complainant
AGENT, OBNDD

Sworn to before me and subscribed in my presence at:    MUSKOGEE, OKLAHOMA

Date: 1-25-16

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## **AFFIDAVIT FOR ARREST**

Affiant, Agent John Morrison, being duly sworn, deposes and says:

### **I. BACKGROUND**

This affidavit for arrest is the result of a joint investigation between the Drug Enforcement Administration (DEA), The Oklahoma Bureau of Narcotics (OBN), and the Tahlequah, Oklahoma, Police Department (TPD). Your affiant is the Case Agent for OBN. This case is an investigation into the **Cody McClendon Drug Trafficking Organization (DTO)**. **McClendon**, who is an Indian Brother Hood (IBH) gang member, is currently an inmate with the Oklahoma Department of Corrections and is incarcerated at a state prison in McAlester, Oklahoma, within the Eastern District of Oklahoma. From interviews of co-conspirators, search warrants and undercover purchases of methamphetamine, it was learned that **McClendon** was utilizing a contraband cellular phone that he kept hidden on his person and inside his prison cell to facilitate the sale and distribution of methamphetamine. **McClendon** was doing this by using the cellular phone to communicate with co-conspirators via audio phone calls, text messages, and by communicating on the social media website Facebook. The cellular phone number that was believed to be utilized by **McClendon** was (918) 931-1428.

On November 23, 2015, the Honorable Clancy Smith, the Presiding Judge of the Oklahoma Court of Criminal Appeals, authorized a wire intercept of wire and electronic communications coming to/from the cellular phone number of (918) 931-1428, which was believed to be used by **McClendon**. The interception of communications coming to/from that cellular phone started on November 23, 2015 and lasted until December 16, 2015, at midnight. From those intercepted communications, it was confirmed the cellular phone was in fact being utilized by **McClendon** while inside an Oklahoma State Prison in McAlester, Oklahoma, and he

1

was using the cellular phone to distribute methamphetamine in the Eastern District of Oklahoma. With those intercepted communications, along with physical surveillance that was being conducted, other co-conspirators were identified and amounts of methamphetamine were seized. Based on the facts presented later in this affidavit, your affiant requests a Complaint be granted charging, **Cody McClendon**, **Michael Lincoln**, **Amber Claphan**, **Donald Trammel**, **Samantha Smith**, **Teresa Chagolla**, **Jacob Masters** and **Nathan Green** with Drug Conspiracy in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A).

## II. AFFIANT'S TRAINING AND EXPERIENCE

Your Affiant, John Morrison, is an Agent with the Oklahoma Bureau of Narcotics and upon being duly sworn states under oath the following:

1.     Your Affiant has been a Peace Officer since January of 2001. Your Affiant began his career with the Overland Park, Kansas, Police Department and worked there as a certified Peace Officer until January of 2004. Your Affiant then moved to the Muskogee, Oklahoma, Police Department in January of 2004 and worked there as a certified Peace Officer until March of 2012. Your Affiant is currently employed by the Oklahoma Bureau of Narcotics and Dangerous Drugs Control (hereinafter OBNDD) as a full-time Peace Officer and Narcotics Agent and has been employed since March 19, 2012.

2.     While working as a certified Peace Officer, your Affiant has spent over eleven years working in patrol and is currently a narcotics investigator. In addition to those duties, your Affiant has served as a member of the Muskogee Police Department's Special Operations Team and Field Training Officer. In 2007, your Affiant earned an instructor certification through C.L.E.E.T. (Council on Law Enforcement Education and Training) and is currently an adjunct Defensive Tactics Instructor.

3.    Your Affiant has attended over 1,200 hours of continuing education and training during his law enforcement career. Your Affiant has attended training specified to the investigation of illegal drug offenses provided by C.L.E.E.T., OBNDD, DEA, Midwest Counterdrug Training Center, Muskogee Police Department and AONE (Association of Oklahoma Narcotic Enforcers). Your Affiant has participated in courses relating to narcotics investigation such as Undercover Survival, Narcotics Air Assault School, the OBNDD Narcotics Investigators School, Criminal Interdiction and the search of electronic devices.

4.    Your Affiant has conducted hundreds of investigations involving drug crimes to include the unlawful manufacturing, distribution, possession of controlled dangerous substances and/or conspiratorial activity related to the same.  During his career, your Affiant has participated in hundreds of interviews of victims, suspects, arrestees, witnesses, cooperating individuals, and informants. Through said interviews, your Affiant has been informed of the various aspects/practices related to the regular activities of the illicit drug business and the operations related thereto.  Your Affiant has written, planned, and executed search warrants, and has testified under oath in court.  Through said training and experience, your Affiant has become especially familiar with the techniques and operations of those involved in the drug trade and their day to day activities.

5.    Your Affiant's experience includes, but is not limited to, patrol, investigations, conducting physical surveillance, and executing search warrants relating to a myriad of offenses including drug crime.  Your Affiant has also acted in an undercover capacity where he has purchased drugs and been utilized in hand-to-hand transactions with drug dealers. Your Affiant has consulted with other experienced officers in narcotics investigations and has worked with other local, state, and federal law enforcement agencies.

6.      Your Affiant has been the case agent in the investigation of large scale drug conspiracies involving the distribution of hundreds of pounds of methamphetamine. From those investigations, your Affiant has written over 40 search warrants, pen registers, and has received authorization from the Oklahoma Court of Criminal Appeals to conduct wire intercepts of cellular telephones.

## III. IDENTIFICATION OF CO-CONSPIRATORS AND ACTS IN THE CONSPIRACY

In the following section, your Affiant will outline the identification of the co-conspirators in this investigation. The facts listed below and within the entirety of this Affidavit are being used to establish probable cause and do not include all information known to your Affiant regarding this investigation.

### A.      Cody McClendon

#### 1.      *Identification of Cody McClendon*

a.      The wire intercept order was authorized for the cellular phone number of (918) 931-1428, which was a cellular phone believed to be used by **Cody McClendon**. During the interception period, the cellular phone number was changed by **McClendon** to (918) 351-9356.

b.      During the interception period, the user of that phone had a male voice. That person would be referred to on some of the intercepted communications as "Cody" and on one intercepted communication was referred to by his full name of "Cody McClendon." **McClendon** is incarcerated in the Oklahoma Department of Corrections from a Robbery conviction in Pittsburg County, Oklahoma. DEA Task Force Officer (TFO) Tim Turner was involved in that investigation and interviewed **McClendon**, and as a result has heard **McClendon** speak. TFO Turner has also had the opportunity to review intercepted audio calls

4

from this investigation. From reviewing the intercepted audio calls, TFO Turner believes the user of cellular phone (918) 931-1428 and (918) 351-9356 to be **McClendon**.

       c.     The cell tower the device was connecting to for service was located in McAlester, Oklahoma, which is where **McClendon** is incarcerated.

       d.     During audio phone calls, **McClendon** would talk about the prison cell he was being housed in and how he was hiding contraband in the cell as well as his interaction with corrections officers and other prison inmates.

**B.**    **Listed below are some of the intercepted communications involving Cody McClendon:**

       1.     *Session 60 on 11/25/2015 at 1316 hours*. Call between **Cody McClendon** and unidentified source of supply. It is unknown if it was an incoming/outgoing call or what phone number **McClendon** was communicating with because the pen register information was not being received during this intercepted communication.

       2.     The following is a brief synopsis of the call: The call was between **McClendon** and an unidentified Hispanic male who appears to be a source of supply of methamphetamine for **McClendon**. The Hispanic male asked **McClendon** if he wanted to do business and told **McClendon** it is $6,200 for a whole one (a reference your Affiant believes to in reference to one pound, or approximately 453 grams, of methamphetamine), and **McClendon** thanked him for bringing it closer to him. The Hispanic male said **Cody** was reliable, and they had been doing business together for five months. They talked about continuing to do business together and about a debt that **McClendon** owed the source and how he would continue to pay it off a little at a time with each additional purchase of methamphetamine. **McClendon** talked about having to pay for people's bonds and attorney's when they get arrested and that's why he's not making that much money because he paying for that and also losing the product when they are arrested. They

continued to talk, and **McClendon** said the person who used to make the most trips to the city for him has caught three trafficking cases and is in jail. The Hispanic male said he charges $200 to deliver the methamphetamine to **McClendon**.

3.    In your Affiant's opinion, this intercepted audio call is a communication between **McClendon** and a source of supply of methamphetamine. When they talked about a "whole one" costing $6,200, your affiant believed that was in reference to one pound of methamphetamine. Your Affiant believes that because **McClendon** was selling methamphetamine in ounce quantities **McClendon** would need to re-supply himself in pound quantities to have enough methamphetamine on hand to distribute to his customers.

4.    *Session 2909 on December 1, 2015 at 1049 hours.* Outgoing conversation between **McClendon** and OBN Agent Jim Ward acting in an Undercover Capacity. On October 20, 2015, law enforcement interviewed an **Amber Claphan** in reference to this investigation. During the interview, **Claphan** identified herself as a co-conspirator in the **McClendon DTO** who had traveled to Oklahoma City, Oklahoma, to pick up quantities of methamphetamine at the direction of **McClendon**. **Claphan** said she communicated with **McClendon** through the instant message function of the social media site Facebook as well as text message and audio calls. Claphan, agreed to introduce Agent Jim Ward of the Oklahoma Bureau of Narcotics, to **McClendon** for an undercover purchase of methamphetamine. **Claphan,** at the direction of law enforcement, sent messages to **McClendon** through the instant message function on Facebook and arranged for Agent Ward to purchase methamphetamine from **McClendon** in an undercover capacity. From those purchases, Agent Ward was able to get a cellular phone number that was used by **McClendon** and continued to purchase methamphetamine from **McClendon**.

5.      The following is a brief synopsis of the call: Agent Ward told **McClendon** he wanted to pay off the "one" he owed **McClendon** and buy "two" more. Agent Ward told **McClendon** he was in Muskogee gambling at the Creek Nation Casino.

6.      In your Affiant's opinion, this communication was in reference to Agent Ward owing $800 for an ounce of methamphetamine that was "fronted" to him on November 6, 2015, during an undercover purchase of methamphetamine. Agent Ward told **McClendon** he wanted to pay for that and pick up two more ounces. A front is where methamphetamine, or some other illegal drug, is given to a customer without it being paid for up front. The customer then takes the illegal substance and sells it to make what is owed for the substance and then pays it back to the seller. Agent Ward later met with a co-conspirator who has been identified as Dusty Drywater, who was sent to the Casino at the direction of **McClendon**. Agent Ward paid Drywater $800 for the ounce he owed and gave Drywater and additional $1,400 and received two more ounces of methamphetamine from Drywater. The references by Agent Ward to "one" or "two more" are in reference to ounces.

7.      *Session 4386 on December 4, 2015, at 1125 hours.* Outgoing call between **Cody McClendon** and Joe LNU (Last Name Unknown.)

8.      The following is a brief synopsis of the call: Joe LNU told **McClendon** he had a little money and could get "five" gathered up. **McClendon** asked if he was going to get a "half" on that and put the rest towards your bill. **McClendon** told him he was going to get his tonight or tomorrow but he would need the money up front, and Joe said he could get his money today. **McClendon** told Joe it would be his price at 600 a "zip" so it will be $4,800 for a "half" and said if Joe just gave him the "whole five" that will work. **McClendon** asked if he had the money right now and Joe said he did and asked if he wanted him to bring the money over there. **McClendon**

asked Joe if he would come down to get it, and Joe said yes and they agreed to meet at the Speedy's convenience store outside of Tahlequah.

9.     In your Affiant's opinion, this call was in reference to Joe LNU wanting to purchase 1/2 pound, or approximately 226 grams, of methamphetamine from **McClendon**. **McClendon** told Joe the price was 600 a "zip", so it would be $4,800 for a half. Your Affiant knows the term "zip" to mean an ounce, so a "half" or 8 ounces would cost $4,800. It also appears Joe LNUK owed **McClendon** money from previous transactions because **McClendon** told him that he can just give him the whole five ($5,000), which Your affiant understands to mean that the first $4,800 will be applied to the 1/2 pound methamphetamine purchase and the remaining $200 will be applied to Joe LNUK's debt.

10.     *Session 5024 on December 5, 2015, at 1344.* Outgoing call, 3-way audio call between **McClendon**, Ashley Steele, and Dusty Drywater.

11.     The following is a brief synopsis of the call: **McClendon** told Steele that someone from Little Kansas was coming down and was bringing $1,100 and was going to pick up two ounces. They continued to talk and Steele told **McClendon** she didn't know where the money or methamphetamine was at **Teresa**'s house, that she hasn't seen it since Dusty left it last night. **McClendon** then called Drywater on a 3-way phone call and kept Steele on the line with them. **McClendon** told Drywater to go to **Teresa**'s and help find the money. **McClendon** then hung up with Drywater and told Ashley to put **Teresa** (**Teresa Chagolla**) on the phone. **Teresa** told **McClendon** she doesn't know what the fuck she is doing and there is a big ass fucking package in her house. **McClendon** told **Teresa** to put Ashley back on the phone, and they figured out the package was 8 zips (8 ounces of methamphetamine) that Ashley and Drywater brought over the previous day and said they also have an additional 80 grams inside the residence. They kept

8

talking about who had dropped off money, and **Teresa** found all of the money in her purse. **McClendon** told them to count it up and told Steele to take two of those and go meet someone at Tahlequah Lumber in a purple Ford Ranger.

12.    In your Affiant's opinion, this audio call was in reference to **McClendon** trying to make sure all of the methamphetamine and money that was being kept at **Teresa Chagolla**'s residence had been accounted for. When the methamphetamine and money was found, **McClendon** had Steele go to Tahlequah Lumber to deliver two ounces of methamphetamine to someone who was going to be in a purple Ford Ranger truck. Surveillance was being conducted in the area of **Chagolla**'s residence and Tahlequah Lumber and observed Steele drive to Tahlequah Lumber and meet with someone in a purple Ford Ranger truck. The person Steele met with was identified by Agent Jim Ward as Derrick Campos.

**C.    Michael Lincoln**

      **1.    *Identification of Michael Lincoln***

          a.    During the interception period of the cellular phone utilized by **Cody McClendon,** there were intercepted communications between **McClendon**'s cellular phone and cellular phone numbers (918) 758-7438, (918) 758-5105 and (405) 694-7075. The user of these cellular phone numbers had a male voice and identified himself as "Link". From the intercepted communications, it appeared the user of these numbers was also incarcerated in the same prison as **McClendon**. During some of the intercepted communications, they would discuss what they were doing that day inside the prison.

          b.    In an interview with **Amber Claphan**, who is a co-conspirator, she identified **Michael Lincoln** as an Indian Brother Hood gang member who is incarcerated at the same prison as **McClendon** in McAlester, Oklahoma.

9

c.     Your affiant spoke with Oklahoma Department of Corrections Investigators Ken Yott and Kathy Mordecai who confirmed that both **McClendon** and **Michael Lincoln** are housed in the Oklahoma State Penitentiary in McAlester, Oklahoma, within the Eastern District of Oklahoma, and are known to them as Indian Brother Hood gang members. From online records obtained from the Oklahoma Department of Corrections website, your Affiant checked to see when **McClendon** and **Michael Lincoln** were incarcerated. The online records show that **McClendon** began his incarceration in the Oklahoma State Penitentiary on September 26, 2008, and currently resides there.  The same records show that **Lincoln** began his incarceration in the Oklahoma State Penitentiary on October 10, 2006, and currently resides there.

d.     Investigator Mordecai, who investigates gang activity inside the prison where **McClendon** and **Lincoln** are housed, told your affiant that she knows **Michael Lincoln** to go by the name of "Link". In addition, Investigator Mordecai was able to obtain an audio recording of **Lincoln** during an interview with Department of Corrections staff on January 13, 2016. Investigator Mordecai sent your Affiant a copy of the audio recording. From listening to the recording, your Affiant believes the voice of **Michael Lincoln**, as provided in the audio recording by Investigator Mordecai, to be the same voice that is captured on the intercepted audio calls and identified in this affidavit as **Michael Lincoln**.

e.     On November 25, 2015, there were intercepted communications where **McClendon** was talking about Link's birthday and that he was cooking food for him inside his prison cell, and they were going to have a birthday dinner later at the prison. The Oklahoma Department of Corrections website lists **Michael Lincoln**'s birthday as November 25, 1976.

**D.     Listed below are some of the intercepted communications between Cody McClendon and Michael Lincoln:**

**Sessions 1996 and 2008, on November 29, 2015 beginning at 0851. SMS text message conversation between McClendon and Michael Lincoln.**

1.      **McClendon:**  *"Morning bro can I come grab two more this evening? Bout three or four clock?.*

Lincoln:       *"We pose reup yesterday..dude got me on hold bro..go ahead go to ur other dude that wut I'm fixin go to today...I'll let you know soon as I'm back on bro"*

2.      The following is a brief synopsis of the call: This was a SMS text message conversation between **McClendon** and a telephone believed to be used by **Michael Lincoln**.

3.      In your Affiant's opinion, **McClendon** was asking **Lincoln** if he could pick up two more, which was believed to be two pounds because of some of the methamphetamine seizures that have been made during this investigation to include the following seizures.

a.      On December 12, 2015, and December 14, 2015, law enforcement intercepted methamphetamine shipments after they were picked up by co-conspirators in **McClendon**'s DTO. While arranging those methamphetamine shipments, **McClendon**, over intercepted calls, would tell his source of supply for that purchase how much he wanted and the amount was simply referenced by a number itself. On the December 12, 2015 shipment, **McClendon**, over intercepted calls, discussed with the source of supply that he wanted to get between 1 ½ and 2. The source of supply, through intercepted calls, advised **McClendon** to have his people go to the Ross Dress for Less parking lot in Muskogee, Oklahoma, and meet with an individual and the source of supply gave a description of the vehicle.  On December 12, 2015, at a time in and around the above referenced intercepted calls between **McClendon** and the source of supply, your Affiant and DEA Task Force Officer (TFO) Tim Turner were conducting surveillance at the Ross Dress for Less in Muskogee, Oklahoma, and observed co-conspirators Dusty Drywater and

Ashley Steele meet an individual, in a vehicle matching the description provided by the source of supply to **McClendon**, at the Ross Dress for Less parking lot in Muskogee, Oklahoma, within the Eastern District of Oklahoma. When Drywater and Steele left the parking lot, they were stopped on a traffic stop by Muskogee Police Department Officers. During the traffic stop, a white crystal like substance that field tested positive for methamphetamine was recovered. The substance was packaged in a Tupperware container and had a combined weight of over 800 grams, which is between one and two pounds.

b.       On December 14, 2015, **McClendon**, over intercepted calls, arranged with a source of supply to pick up what was referred to as "two of those." A co-conspirator, who has been identified as **Nathan Green**, was sent to Tulsa, Oklahoma, to pick up the methamphetamine. On December 14, 2015, your Affiant and other members of law enforcement followed **Green** from Tahlequah, Oklahoma, within the Eastern District of Oklahoma, to Tulsa, Oklahoma.  In a previous intercepted call, **McClendon** advised **Green** to travel to a specific Tulsa residence to pick up the methamphetamine. When **Green** left the Tulsa residence as described by **McClendon**, he was stopped on a traffic stop by the Tulsa Police Department and approximately two pounds of a white crystal like substance that field tested positive for methamphetamine was recovered.

c.       From these two seizures on December 12 and 14, 2015, your Affiant believes that when **McClendon** communicates with a methamphetamine source of supply, **McClendon** uses numbers such as "1", "1 ½", and "2" to describe "pound" quantities of methamphetamine.  In the above-referenced text communication on November 29, 2015, in your Affiant's opinion, **McClendon** is requesting "2" pounds of methamphetamine from **Lincoln** who replies that he expected to have access to a large amount of methamphetamine on the previous day; however, he

currently does not have access to two pounds of methamphetamine. In the text exchange, **Lincoln** also told **McClendon** to check with his other source of supply for methamphetamine and that **Lincoln** will contact **McClendon** when **Lincoln** has access to methamphetamine in the future.

**Sessions 2987, 2989, 2990, 2991, and 2992 on December 1, 2015, beginning at 1252 hours. SMS text message conversation between McClendon and Michael Lincoln.**

    1.      **Lincoln**: *"When u get ready again let me know I'm back on for 6"*

            **McClendon**: *"He'll yea bro should be tomorrow or thursday"*

            **Lincoln**:    *"Ok just let me know"*

            **McClendon**:  *"That stuff is fire to bro. Mvto big luv"*

            **Lincoln**:    *"Enkv…big luv"*

    2.      In your Affiant's opinion, this text message conversation is in reference to a future purchase of methamphetamine. When **Lincoln** tells **McClendon** he's back on for 6, that is a reference to a price for the methamphetamine, possibly $6,000 for 1 pound. From this wire intercept your affiant knows that **McClendon** was purchasing methamphetamine for $6,000 per pound. The conversation continues by **McClendon** telling Lincoln that he will be ready for a future purchase tomorrow or Thursday and says the stuff is fire, which from experience your affiant knows to mean the quality of the methamphetamine.

**Sessions 3571, 3572, 3573, 3576, 3578 on December 2, 2015 beginning at 1758 hours. SMS text message conversation between McClendon and Michael Lincoln.**

    1.      **McClendon**:  *"I come c u tomorrow eve to."*

            **Lincoln**:      *"Big luv"*

            **McClendon**:   *"OK bro I'll b ready just let me know when u ready"*

            **Lincoln**:      *"Will do bro Mvto big luv"*

            **McClendon**:   *Enkv…big luv"*

**Sessions 3936, 3937, 3938, 4045, 4046, 4047, 4049, 4052, 4053, 4054, 4056, 4059, 4060, 4087, 4088, 4089, 4090, 4091, 4092, 4093, 4101, 4102, 4139, 4141, 4142, 4143, 4144 on December 3, 2015, beginning at 1352 hours. SMS text message conversation between McClendon and Michael Lincoln.**

| | |
|---|---|
| Lincoln: | *"wut time u gonna b headed my way"* |
| McClendon: | *"Leave quah round 5:30.bro I'm trying to get two at least.."* |
| Lincoln: | *"OK...two or not three all good"* |
| *McClendon*: | *"K bro I got 10.500. U want me come on or wait till tomorrow"* |
| McClendon: | *"N I got 8 zip left"* |
| Lincoln: | *"Bring the 10.5....owe me the rest n drop off n day or two...."* |
| McClendon: | *"Ok bro I'm on way big luv"* |
| Lincoln: | *"Big luv call me when u get outside Tulsa shoot Me the number"* |
| McClendon: | *"Name: Duzt Mobile: 918-931-2709...that's number bro he just leaving quah"* |
| McClendon: | *"Quah"* |
| Lincoln: | *"Let me know he get outside Tulsa"* |
| McClendon: | *"Got ya bro...we prob skip shower our neighbor going tho.."* |
| Lincoln: | *"Cool"* |
| Lincoln: | *"Sup snag...where he at?"* |
| McClendon: | *"On ur side of Muskogee"* |
| McClendon: | *"KBe bout 45 min bro"* |
| Lincoln: | *"K"* |
| Lincoln: | *"Before he n tulsa?"* |
| McClendon: | *"Yea"* |
| Lincoln: | *"K"* |
| McClendon: | *"Past b.a. few min ago bro"* |
| Lincoln: | *"Ok"* |
| Lincoln: | *"All good"* |
| McClendon: | *"Yep Mvto brother"* |
| Lincoln: | *"Enkv"* |

14

> Lincoln:     *"U got it?"*
>
> Lincoln:     *"U got it?"*

**Session 4145 on December 3, 2015 at 2007 hours. Incoming audio call between Michael Lincoln, Cody McClendon, and Dusty Drywater.**

This is an incoming call from **Michael Lincoln** to **McClendon**. **Lincoln** asks **McClendon** if he has it already. **McClendon** asks if **Lincoln** is talking about the stuff and **Lincoln** says yeah. **McClendon** says yeah his guy got it and his boy is heading back to his babes. **Lincoln** tells **McClendon** that his homeboy called him and **McClendon's** guy didn't show up. **McClendon** calls Dusty Drywater on a 3-way phone call and asks him where he went. Drywater says he actually got lost but is three miles away and is headed there. **Lincoln** says they are there waiting.

**Sessions 4159, 4161, 4162 on December 3, 2015 beginning at 2025 hours. SMS text message conversation between McClendon and Lincoln.**

> McClendon:     *"Got it bro mvto"*
>
> Lincoln:     *"Let me know when u make it home safe"*
>
> McClendon:     *"Will do my brother"*

2.      In your Affiant's opinion, the text messages referenced above dated December 2 and 3, 2015, and the audio conversation between **McClendon** and **Lincoln** on December 3, 2015, are in reference to the purchase of methamphetamine and indicate that **McClendon** and **Lincoln** are coordinating with one another in an effort to enable Drywater to obtain methamphetamine from an individual under the direction of **Lincoln**. During the intercepted text communication on December 3, 2015, beginning at 1352 hours, **Lincoln** asked **McClendon** if he wanted two or three (which your Affiant took to mean two or three pounds). **McClendon** told **Lincoln** he only has $10,500 and asked **Lincoln** if he wanted him to wait until tomorrow. After those intercepted communications, **McClendon**, through additional intercepted communications,

directed co-conspirators in his organization to start collecting the money that was owed to the **McClendon DTO. McClendon**, through intercepted calls, contacted co-conspirators who have been identified as Dusty Drywater and Ashley Steele to travel to Tulsa, Oklahoma, to pick up the methamphetamine. Surveillance was able to follow co-conspirators Dusty Drywater and Ashley Steele to a neighborhood near the intersection of Pine and Lewis in Tulsa, Oklahoma, where it is believed they picked up two pounds of methamphetamine. This is believed because after going to the neighborhood, Drywater and Steele drove to **Samantha Smith**'s (a co-conspirator who is referenced later in this Affidavit) residence 603 S. 22nd Street, Muskogee, Oklahoma, where an audio communication was intercepted where monitors could hear Drywater and **Smith** talking about weighing out methamphetamine into smaller quantities. While this was going on, your Affiant directed OBN Agent Jim Ward to contact **McClendon** in an undercover capacity and ask if he could purchase six ounces of methamphetamine. Agent Ward contacted **McClendon** and he agreed to the purchase. After intercepted communications indicated that **Smith** and Drywater weighed out the methamphetamine, surveillance observed **Smith** deliver approximately six ounces of a white crystal like substance that field tested positive for methamphetamine to Agent Ward. The exact instructions from **McClendon**, on intercepted communications to **Smith** and Drywater, was for **Smith** to keep two (ounces) at her residence and take six (ounces) to Agent Ward. Drywater was to take the rest of the methamphetamine to Don (Donald Trammel). Don would then give Dusty six (ounces) and keep the rest.

## E.     Amber Claphan

### 1.     October 20, 2015, Interview of Amber Claphan

On October 20, 2015, DEA Task Force Officer Tim Turner interviewed **Amber Claphan** at the West Siloam Springs, Oklahoma, Police Department. **Claphan** had been arrested the previous

day in West Siloam Springs for trying to pass a $100 dollar bill that was believed to be counterfeit. During her arrest, **Claphan** was found to have a white crystal like substance in her possession believed to be methamphetamine. The interview with **Claphan** was non-custodial and took place the day after she was arrested by the West Siloam Springs, Oklahoma Police Department. **Claphan** met with law enforcement voluntarily and was free to leave at any time during the interview. In addition, the interview was audio recorded by law enforcement.  Below is a synopsis of what **Claphan** told investigators:

a.        **Claphan** told investigators she was a methamphetamine trafficker. She said her husband, Matthew Scraper, was a member of the Indian Brother Hood prison gang and was currently incarcerated at the Cimarron Correctional Facility in Oklahoma.

b.        Through her husband, she was introduced to **Cody McClendon** in June of 2015. **McClendon** is also a member of the Indian Brother Hood and is incarcerated at an Oklahoma State Prison in McAlester, Oklahoma. **Claphan** was introduced to **McClendon** for the purpose of buying methamphetamine from **McClendon**. **Claphan** said **McClendon** is trafficking methamphetamine from the prison with the use of a cellular phone.  She said he would use the phone to place audio calls, SMS text messages, or would send instant messages through his Facebook account.

c.        On or around the July 4, 2015, weekend, **McClendon** arranged for **Claphan** to purchase and pick up 1/2 pound of methamphetamine in Oklahoma City, Oklahoma, for $3,700.00. **Claphan** said she drove to Oklahoma City and met with an unknown Hispanic male and paid for and picked up the methamphetamine. **Claphan** said she took the 1/2 pound of methamphetamine and distributed it but lost approximately $2,500.00 in profit and became in debt

to **McClendon**. As a result of the debt, **McClendon** would only allow her to purchase methamphetamine in ounce quantities from that point forward.

        d.      **Claphan** went into detail about the prices that were paid for methamphetamine purchased from **McClendon**. She said ounces were sold for $650 per ounce if they were paid for in advance, $750 per ounce if paid for at the time of the transaction, and $850 per ounce if the methamphetamine was provided on a "front". *(A "front" is a typical reference to receiving the drug up front and paying for it on a later date.)*

        e.      **McClendon** would hire drivers to pick up shipments of methamphetamine. He would pay the drivers approximately $250 per trip or he paid them with methamphetamine. **Claphan** said she became a driver for **McClendon** after she fell into debt with him for the 1/2 pound transaction.

        f.      Between July 2015 to September 2015, **Claphan** or someone else working for **McClendon** made a trip to Oklahoma City, Oklahoma, to pick up methamphetamine for **McClendon**. On each trip, they purchased between 1½ to 3 pounds of methamphetamine at a time from different unknown Hispanic males each time. **Claphan** said she paid anywhere from $12,000 to $26,750 in U.S. currency for the methamphetamine. **Claphan** said Matilda Birdtail, Regina Hummingbird, **Samantha Smith**, and Gary Wilder had all made trips with her to Oklahoma City to pick up methamphetamine for **McClendon**. **Claphan** said the methamphetamine that was picked up was taken to 603 S. 22nd Street, Muskogee, Oklahoma. **Claphan** estimated that she made approximately 12 trips to Oklahoma City in a one month period.

        g.      **Claphan** said that as part of the Indian Brother Hood hierarchy, **McClendon** answered to a **Michael Lincoln**. **Claphan** understood **Lincoln** to be what is referred to as a "WAR CHIEF" in the organization. As a part of being a driver for **McClendon**, **Claphan** said she was

18

directed to drop off money that **McClendon** owed **Lincoln**. These drop-offs were at a residence in Broken Arrow, Oklahoma, to a female subject with the first name "Teresa". **Claphan** said "Teresa" is supposed to be **Lincoln**'s mother.

        h.    **Claphan** identified other members of the **McClendon DTO** as Regina Hummingbird, Joshua Mouse, Matthew Spencer and Natasha Poafybitty. Your affiant, in an attempt to corroborate the information provided from **Claphan** in reference to these co-conspirators, has learned the following:

        i. Regina Hummingbird was arrested on December 13, 2015, in reference to the wire intercept. On that day, audio communications were intercepted where **McClendon** was directing a female subject, who was believed to be Regina Hummingbird, to go to the address of 603 S. 22nd Street, Muskogee, Oklahoma 74401 to pick up 2 ounces of methamphetamine. No one was at the residence and **McClendon** gave the female subject instructions on how to get in. Your Affiant and TFO Turner were conducting surveillance and observed two female subjects arrive at the residence and go inside. When the female subjects left the residence, your Affiant had Sgt. William Peters of the Muskogee Police Department stopped them on a traffic stop. Once the vehicle was stopped, Sgt. Peters identified the driver of the vehicle as Regina Hummingbird and the passenger as Matilda Birdtail. Sgt. Peters had his police K-9 conduct an open air sniff of the vehicle. The K-9 indicated to the odor of narcotics coming from in and around the vehicle. A search of the vehicle as well as Hummingbird and Birdtail was conducted. During the search approximately 2 ounces of a white crystal like substance that field tested positive for methamphetamine was recovered.

ii. Through online court records at www.odcr.com your affiant located 3 prior possession of controlled dangerous substance charges (CF-2011-00528, CF-2013-00363, CF-2013-00492) and a pending Trafficking in Illegal Drugs charge (CF-2015-00321) out of Cherokee County for Joshua Mouse who is currently incarcerated at the Cherokee County Jail.

iii. During this investigation, a Clarissa Walker was used as an informant by the Tahlequah Police Department and Drug Enforcement Administration. At the direction of those agencies, Walker purchased methamphetamine from Matthew Spencer in Tahlequah, Oklahoma. Your affiant has had the opportunity to interview Walker on two different occasions. Walker has told your Affiant she is familiar with **McClendon** and has purchased methamphetamine from him since he has been incarcerated within the Oklahoma Department of Corrections. Because of those purchases and her involvement in the **McClendon DTO**, Walker told your Affiant she believed the methamphetamine she purchased from Spencer to be methamphetamine that came from **McClendon**.

iv. On November 20, 2014, Natasha Poafybitty was arrested by the Tahlequah Police Department for being in possession of approximately 475 grams of a substance that field tested positive for methamphetamine and possession of a firearm after former felony conviction. During a post-arrest interview with law enforcement, Poafybitty, said she was directed by **McClendon** through Facebook to go to Tulsa, Oklahoma to pick up the methamphetamine that was found in her possession during her arrest.

v. At this time, your Affiant has not been able to identify **Michael Lincoln**'s mother, "Teresa".

20

i.    **Claphan** said from being involved in the DTO she knew Wilder to be producing counterfeit currency which **Claphan** believed was being used to purchase methamphetamine.

j.    **Claphan** said she is currently in debt to **McClendon**. **Claphan** said her husband, Scraper, made contact with **McClendon** and settled the debt but told **McClendon** not to sell methamphetamine to Claphan.

2.    **January 4, 2016, Interview of Amber Claphan**

a.    On January 4, 2016, your Affiant interviewed **Amber Claphan**. The interview was in reference to **Claphan** being arrested on January 2, 2016, by the Stilwell, Oklahoma, Police Department for Possession of Methamphetamine with the Intent to Distribute and Possession of a Firearm in the Commission of a Felony. The interview was voluntary and took place after **Claphan** was released from the Adair County, Oklahoma Jail. Once she was released, **Claphan** contacted Tahlequah Police Investigator Todd Carnes and said she wanted to speak with law enforcement. **Claphan** agreed to meet your Affiant and Investigator Carnes in a public place in Tahlequah, Oklahoma where she was interviewed. The interview was audio recorded. Below is a synopsis of what **Claphan** told your Affiant:

b.    **Claphan**, said she had been arrested by the Stilwell Police Department on January 2, 2016, for Possession of Methamphetamine with the Intent to Distribute. **Claphan** said she fell asleep in a parking lot in the driver's seat of a vehicle and someone called the police. **Claphan** said police found what they believed to be methamphetamine, but it was really just MSM. From training and experience, your Affiant knows MSM is arthritis medication that is commonly used to treat horses. It is a white substance that mirrors the look of methamphetamine. Oftentimes, those in the drug trade will use it as a cutting agent in that it will be mixed in with

21

actual methamphetamine to make the quantity that is being sold to look like a larger amount which will increase the profit that is made. She said they field tested the MSM, and there must have been trace amounts of methamphetamine on or around it because it field tested positive and she was arrested.

   c. Your Affiant reminded **Claphan** of her earlier interview on October 20, 2015, with TFO Tim Turner and told Claphan your Affiant was currently investigating the Indian Brother Hood, specifically **Cody McClendon**.

   d. **Claphan** acknowledged who **McClendon** was and said she called him the night of the arrest (January 2, 2016) because that is what you are supposed to do. (Your Affiant took this to mean that is what you are supposed to do when you distribute methamphetamine for **McClendon**.) She told him that in addition to the methamphetamine charge she had gotten caught with a .22 caliber rifle that was **McClendon's** that he wanted her to trade for some money. She said she is not a convicted felon, and she was charged with a Felon in Possession of a Firearm while in Commission of a Felony.

   e. **Claphan** said **McClendon** was working on getting all of his people out that are currently in jail for getting arrested for Possession of Methamphetamine that belonged to **McClendon**. The only person she knew of so far that had been bonded out was **Samantha Smith**. **Claphan** said he had found a bondsman who would do it for $7,500 a person.

   f. Your Affiant asked **Claphan** why she stopped making those trips to pick up methamphetamine for **McClendon**. **Claphan** said it was because **McClendon** thought she had stolen money and approximately 2 ounces of methamphetamine. **Claphan** remembered the trip she was talking about took place around the week after Labor Day in 2015. She said she went with Regina Hummingbird and an unknown female who was a friend of Hummingbird's.

g.     **Claphan** said prior to going to Oklahoma City, they (her and Hummingbird) picked up money for **McClendon** from other co-conspirators. She said she picked up $15,000 from a guy named **Donald** who lived in Woodall. She said they (**Claphan** and **Donald**) met at the Woodall gas station located directly off Highway 62. **Claphan** said she had met **Donald** before and had delivered methamphetamine to him in the past. She said every time she went to Oklahoma City to pick up methamphetamine, she was instructed by **McClendon** to drop off 1/2 pound of methamphetamine to **Donald**. **Claphan** was shown photographs of a **Donald Trammel**. **Claphan** identified him as the person she was talking about.

h.     On that same trip to Oklahoma City, **Claphan** also picked up $6,000 from a lady she knew as **Teresa** who lived on Cherokee Street in Tahlequah, Oklahoma. **Claphan** was shown a photograph of **Teresa Chagolla**, and **Claphan** identified **Chagolla** as the person she was talking about.

i.     **Claphan** said she also picked up $6,000 from **Samantha Smith** that was used for the methamphetamine purchase.

j.     After picking up all of the money, **Claphan**, Hummingbird, and the unknown female went to Oklahoma City and picked up 3 1/2 pounds of methamphetamine from an unknown Hispanic male at a Sonic restaurant at 29th and Shields, Oklahoma City. **Claphan** said the methamphetamine was packaged in four different zip lock bags. **Claphan** said she didn't know the male subject but had picked up methamphetamine from him in the past. She said she recognized him from the white truck he drove. After picking up the methamphetamine, **McClendon** called her and said the money that was paid to the Hispanic male was $1,500 short, and there was also 2 ounces of methamphetamine that was missing from **Samantha Smith's**

23

residence. **McClendon** believed **Claphan** had taken the two ounces when she was at **Smith's** residence earlier picking up money.

k.    Your Affiant asked **Claphan** if she had started picking up amounts of methamphetamine for **McClendon** again, and **Claphan** said yes, that she had made one trip. **Claphan** said **McClendon** contacted her by Facebook and text message in December of 2015 after several co-conspirators had been arrested. She said she didn't realize that several people had been arrested until she talked to **McClendon**. **McClendon** told her about the arrests and from talking to **McClendon, Claphan**, estimated that at least 4 1/2 pounds of methamphetamine had been seized.

l.    **Claphan** said she made the trip with **McClendon's** uncle and someone who sold methamphetamine for the uncle. (Your Affiant knows that **Jacob Masters** is **McClendon's** uncle). **Claphan** said they drove to the area of NW 23rd and Meridian or Rockwell to a Mexican market. **Claphan** identified a photograph of **Jacob Masters** as the person she knew to be **McClendon's** uncle. She said they didn't bring any money with them and the methamphetamine was fronted to them. When they got there, **McClendon's** uncle got out of the car and did the transaction. **Claphan** said she assumed it was at least a pound of methamphetamine that was fronted to them. She believed that because there was never a time that she picked up methamphetamine for **McClendon** when she picked up under one pound.

m.    **Claphan** said she would have made additional trips for **McClendon** but **Claphan** made **McClendon** mad because **Claphan** passed $500 in counterfeit money to **McClendon's** uncle. The money was paid to purchase 1 1/2 ounces of methamphetamine from **McClendon's** uncle.

n.    Since making that trip, **Claphan** knew of at least another trip to Oklahoma City that was made to pick up methamphetamine on December 30, 2015. That trip was made by "Sheena". **Claphan** knew about it because Sheena used her car to make the trip. **Claphan** did not know how much methamphetamine was picked up, but as payment for the use of her car, Sheena gave her 1/2 of an ounce of methamphetamine.

o.    During the interview, **Claphan** also talked about **Michael Lincoln**. **Lincoln** is an IBH member who is incarcerated at the same prison in McAlester. **Claphan** believes **Lincoln** is a member of the High Council of the Indian Brotherhood and is a higher ranking member than **McClendon**. **Claphan** said, at the direction of **McClendon,** she would take money to Lincoln's mother in Broken Arrow, Oklahoma. **Claphan** only knew her first name as Teresa and said people called her Mom IBH.

p.    **Claphan** said the money she paid to Teresa was from the profits that were made from selling methamphetamine. Teresa would then take that money and would disperse it to other IBH members. **Claphan** said she did not know where Teresa lived but said they would usually meet at the Whataburger off of Kenosha St. in Broken Arrow. **Claphan** remembered Teresa telling her that she only lived a few minutes from there.

q.    After the last trip she made for **McClendon** in 2015, she began selling methamphetamine at the direction of **Lincoln**. Once she started doing that, she would pick up the methamphetamine in Henryetta or Sapulpa, Oklahoma.

r.    **Claphan** said she distributed methamphetamine that she picked up through **Michael Lincoln** during the month of September 2015. On September 25, 2015, she stopped selling methamphetamine for **Lincoln**. This was done at the direction of her husband, Matthew Scraper. Scraper is also an IBH gang member who is incarcerated at a state prison

facility in Holdenville, Oklahoma. **Claphan** said that was only temporary, and she began distributing methamphetamine again in order to make money. **Claphan** said she would purchase the methamphetamine in 1/2 pound quantities from **Lincoln**, and it would be fronted to her for $4,400.

s.    **Claphan** had a cellular phone in her possession and said the phone number for it was (918) 575-8095 as well as an old cellular phone she was no longer using but it still had stored text messages. **Claphan** said she had used the same cellular phone number for both phones and had simply changed cellular service from one phone to the other. During the interview, she gave your Affiant consent to search both devices. **Claphan** showed your affiant messages that were sent between her and **McClendon** through the Facebook instant messenger service. The messages were dated from November 29, 2015 to December 30, 2015 and showed communications between her and **McClendon** in reference to him supplying her with quantities of methamphetamine and her traveling to Oklahoma City to pick up methamphetamine a couple of days before Christmas, although the trip was cancelled by **McClendon**. Your Affiant asked **Claphan** specifically about one of the stored text messages from **McClendon** that was directing her to go to Muskogee, Oklahoma, to pick up money prior to her going to Oklahoma City, Oklahoma. **Claphan** said she understood that text message to mean she needed to go by Samantha Smith's residence to pick up money that was going to be needed for the purchase of methamphetamine. **Claphan** said the trip she did make for **McClendon** took place prior to those communications.

t.    **Claphan** said that she wired money by Money Gram in 2015 at the direction of **McClendon**. The money that was wired was from earnings made from distributing methamphetamine. **Claphan** said the account she wired the money from is in her name.

26

**F.      Interception of Amber Claphan**

On December 6, 2015, there were intercepted text messages between **McClendon** and **Amber Claphan**'s cellular phone number (918) 575-8095. In those text messages, **Claphan** asked how much half a zip (ounce) would cost. **McClendon** responded and said it would cost $350, but she would have to send someone to get it because he cannot deal with her until bro (whom your Affiant believes to be **Claphan**'s husband, Matthew Scraper) says it's okay. Your Affiant believes this is in reference to **Claphan**'s husband trying to stop her from getting amounts of methamphetamine from **McClendon** and **Michael Lincoln** that **Claphan** had referenced in her interviews with law enforcement.

**E.      Donald Trammel**

**        1.      Identification of Donald Trammel**

a.      In an interview with **Amber Claphan**, she identified **Donald Trammel** as someone she knew as a co-conspirator in the **McClendon DTO**. Claphan said every trip she made to Oklahoma City, Oklahoma, to pick up methamphetamine for **McClendon,** she was always instructed to drop off approximately 1/2 of a pound to **Trammel** when she got back. **Claphan** said on one trip she remembered picking up approximately $15,000 in U.S. currency from **Trammel** that was used for a 3 1/2 pound methamphetamine purchase in Oklahoma City, Oklahoma.

b.      **Claphan** said she would always meet **Trammel** in Woodall, usually at a gas station located off of Hwy 62. From checking property records, your Affiant located a **Donald Trammel** who lives at 25482 South Woodall Dr., Tahlequah, Oklahoma. That address is located in a neighborhood that is approximately one block north of the gas station that **Claphan** said she would meet **Trammel**.

c.      During the wire intercept, there were intercepted communications between **McClendon** and the cellular phone numbers of (918) 822-2358 and (918) 453-3872. The user of the phones had a male voice that was called "Don".

d.      On November 24, 2015, there were intercepted communications between **McClendon**, cellular phone number (918) 822-2358 (**Donald Trammel**) and a co-conspirator who has been identified as Dusty Drywater. The communications were in reference to Drywater meeting the user of cellular phone number (918) 822-2358 (**Donald Trammel**) to drop off approximately two pounds of methamphetamine. From the intercepted communications, it appeared as if the meeting was going to take place away from **Trammel**'s residence.

e.      TFO Turner, who was conducting surveillance during the time of the intercepted communications, observed a vehicle leave the residence on Woodall Dr. and drive south from the residence. Approximately 25 minutes later, the vehicle returned and parked in front of the residence on the street. The tag on the vehicle (a silver Ford Fusion) was a Cherokee Nation of Oklahoma Tag, License Number 968-28C. The registration shows the vehicle the tag is on to be registered to a **Donald** and Brandy **Trammel**.

**F.      Intercepted Communications of Donald Trammel**

**Sessions 155 and 160 on November 24, 2015 at 1917 hours. SMS text messages sent from Donald Trammel**

**Trammel:**      *"I sent 280 g with him"*

**Trammel:**      *"That's cool right brother that's 10 zips"*

1.      The text messages are in reference to the surveillance referenced above where communications were intercepted where Dusty Drywater was taking approximately two pounds of methamphetamine to **Donald Trammel**. In addition to those text messages, there were additional communications between **McClendon** and **Trammel**, and later **McClendon** and

Drywater, that indicate that Drywater took the two pounds of methamphetamine to **Trammel** where it was broken down into smaller amounts. After it was broken down, **Trammel** gave Drywater 280 grams, which is approximately 10 ounces, or "zips".

**Session 512 on November 25, 2015 at 1750 hours. Incoming call from Donald Trammel to Cody McClendon.**

1.      The following is a brief synopsis of the call: **Trammel** told **McClendon** that he had flipped three "zips" to three different people, and **McClendon** told **Trammel** that a guy from Checotah came and turned in 17.

2.      In your Affiant's opinion, the reference having "flipped 3 zips" was **Trammel** saying he had sold three ounces of methamphetamine. As stated earlier, your Affiant knows the term "zip" to mean an ounce. When **McClendon** said a guy from Checotah came in and turned in "17", your Affiant believes that is in reference to a co-conspirator who lives in Checotah turning in $1,700 in U.S. currency.

**Session 1179 on December 6, 2015 at 1342 hours. Outgoing call from McClendon to Donald Trammel.**

1.      The following is a brief synopsis of the call: **McClendon** told **Trammel** to get six of those "deals" ready and meet Sam at the store. **Trammel** agreed and **McClendon** said he would let him know when Sam got close.

2.      In your Affiant's opinion, this audio call is about **Trammel** getting six ounces of methamphetamine ready for **Samantha Smith**, an identified co-conspirator to pick up. During the wire intercept, **McClendon** would refer to ounces as "deals" or "things", so when **McClendon** said "six deals", your Affiant believes he was talking about six ounces. Your affiant believes the store that **McClendon** was talking about was the gas station that was located by **Trammel**'s residence.

**Session 10377 on December 13, 2015 at 1943 hours. Outgoing call between McClendon and Donald Trammel.**

1.    **McClendon** told **Trammel** he was sending Gina to pick up 2 1/2 "zips" and $1,000 that was in a safe, and he wanted **Trammel** to meet her at 4 Mile Road to pick it up. **McClendon** said that is all they are sitting on because the cops got the rest and he's getting ready to call brother and tell him. **McClendon** told **Trammel** they will need to re-up and last time they had to go to Kellyville, which is west of Tulsa. **McClendon** said last time it was brought to Muskogee but that was from the Mexicans. **McClendon** said this was the same stuff, and by getting from brother, they get it for the same price he gets it for and they don't have to pay any extra. (This is in reference to **McClendon** owing a source of supply money for methamphetamine. During the wire intercept from the communications, it appeared that **McClendon** and **Lincoln** were getting methamphetamine from the same source of supply. From the intercepted communications, it appeared the source of supply is also incarcerated, possibly at the same prison in McAlester, Oklahoma. By having **Lincoln** purchase the methamphetamine from the source of supply and then **McClendon** buying it from **Lincoln**, **McClendon** does not have to pay the extra money that is owed to the source of supply.)

2.    In your Affiant's opinion, that audio call was in reference to Regina Hummingbird going to **Samantha Smith**'s residence to pick up methamphetamine and money to take to **Donald Trammel**. On December 13, 2015, your Affiant was on surveillance and observed two females, later identified as Regina Hummingbird and Matilda Birdtail, go to **Samantha Smith**'s residence in Muskogee, Oklahoma. After they left, they were stopped on a traffic stop by the Muskogee Police Department, and approximately two ounces of a white crystal like substance that field tested positive for methamphetamine was recovered. As the traffic stop was being made, **McClendon** sent **Trammel** a text message (Session #10388) saying

*"Hold up bro they getting pulled over....I'm on phone with em still."* The reference to "re-up", made by **McClendon** in the intercepted call, is referring to being resupplied with methamphetamine. During the wire intercept **McClendon** directed **Samantha Smith** to meet someone in Kellyville to pick up two pounds of methamphetamine that **McClendon** got through **Michael Lincoln**. Your Affiant was on surveillance and watched while **Smith** met with someone at a storage unit facility in Kellyville, Oklahoma, to pick up the methamphetamine. The reference to the Mexicans bringing it to Muskogee was a delivery that was made to co-conspirators Dusty Drywater and Ashley Steele. Your Affiant was again on surveillance, and after the transaction, had Drywater and Steele stopped on a traffic stop by the Muskogee Police Department. During the traffic stop, over 800 grams of a white crystal like substance that field tested positive for methamphetamine was recovered.

## G.    Samantha Smith

### 1.    Identification of Samantha Smith

a.    In interviews with law enforcement, **Amber Claphan** identified **Samantha Smith** as a co-conspirator in the **McClendon DTO**. **Claphan** identified **Smith**'s residence, 603 S. 22nd Street, Muskogee, Oklahoma 74401, as a place **Claphan** would take methamphetamine after picking the methamphetamine up in Oklahoma City, Oklahoma.

b.    Through a utilities check through the City of Muskogee, the utilities for that address show to be in the name of **Samantha Smith** with a contact phone number of (918) 990-1094.

c.    During the wire intercept, there were intercepted communications between **McClendon** and cellular phone number (918) 990-1094. The user of that cellular phone had a female voice that **McClendon** would call "Sam" or "Sam Smith".

**H.      Interception of Samantha Smith**

1.      Listed below are some of the intercepted communications between **McClendon** and **Samantha Smith**:

**Session 4173 on December 3, 2015 at 2129 hours. Outgoing call between McClendon, Samantha Smith, and OBN Agent Jim Ward.**

2.      The following is a brief synopsis of the call: **McClendon** told **Smith** that Dusty was there now. **Smith** was talking to **McClendon** on the phone and Dusty Drywater was in the background. **Smith** talked about using the big scale and how to switch it to ounces. **McClendon** told **Smith** that when they were done weighing it out, she needed to keep two and take six to the Travel Plaza. **McClendon** said Dusty would take the rest to **Donald**, and **Donald** would give Dusty six. The call continued between **McClendon** and **Smith**, and he (**McClendon**) later called OBN Agent Ward on a 3-way call. **McClendon** asked Agent Ward if he was there and he said yes and was in a blue truck. Agent Ward asked if she was in a sport utility vehicle with shiny wheels and **Smith** said yes. Agent Ward asked if he needed to walk over to her, and **McClendon** said yes. In the background, you can hear Agent Ward and **Smith** talking, and **Smith** told Agent Ward thank you.

3.      In your Affiant's opinion, this call is in reference to **Samantha Smith** delivering approximately six ounces of a substance believed to be methamphetamine to OBN Agent Ward on December 3, 2015. Prior to the transaction, surveillance followed Drywater to Tulsa where it was believed he picked up two pounds of methamphetamine that was sold to **McClendon** from **Michael Lincoln**. (This is referenced earlier in the affidavit under the section for **Michael Lincoln**.) On December 3, 2015, surveillance followed Drywater back to **Smith**'s residence at 603 S. 22nd Street, Muskogee, Oklahoma. When the phone call between **McClendon** and **Smith** began, it appeared the methamphetamine was being divided up into smaller amounts.

McClendon told **Smith** she needed to keep "two" (ounces) at her house and take "six" (six ounces) to the Travel Plaza. **McClendon** told **Smith** that Dusty would take the rest of the methamphetamine to Don (**Donald Trammel**) and he (**Trammel**) would give Dusty "six". On December 3, 2015, while Drywater was going to Tulsa, Agent Ward contacted **McClendon** and asked if he could purchase six ounces of methamphetamine, and they would meet at the Travel Plaza. On December 3, 2015, surveillance followed **Smith** from her residence to the Travel Plaza where she sold approximately six ounces of a substance that was field-tested positive for methamphetamine to Agent Ward.

**Session 5761 on December 6, 2015 at 1332 hours. Outgoing audio call between McClendon, Samantha Smith, and Donald Trammel.**

4.    The following is a brief synopsis of the call: **McClendon** told **Smith** to go to **Donald**'s to get "two of those things" and told her to go to his trailer. **Smith** told **McClendon** she did not know where it was so **McClendon** called **Trammel** on a 3-way phone call with **Smith**, and **Trammel** gave **Smith** directions to where he would be located.

5.    In your Affiant's opinion, this audio call was in reference to **Samantha Smith** meeting **Donald Trammel** to pick up two ounces of methamphetamine. From the investigation, it was learned that **Trammel** owns a trailer that is located along the same road as his residence. **Smith** did not know where the trailer was so **McClendon** called **Trammel** so he could give **Smith** directions. In an earlier audio call (Session #5740) between **McClendon** and **Trammel**, he (**Trammel**) told **McClendon** that he would have them sacked up individually for her.

**Session 10267 on December 13, 2015 at 1545 hours. Outgoing call between McClendon, Samantha Smith, and Donald Trammel.**

6.    The following is a brief synopsis of the call: **McClendon** and **Smith** talked about how much methamphetamine was at her residence, and **Smith** said 14 and a half. **McClendon**

told her to take 12 of those to Don and leave the rest at the house, and he would see if he (**Donald Trammel**) could meet her at 4 Mile Road. **McClendon** then called **Trammel** on a 3-way phone call with **Smith** and **McClendon** asked **Trammel** if he could meet **Smith** at the store at 4 Mile Road.  **Trammel** agreed. **McClendon** asked **Smith** if she was ready to leave, and she said yes. **McClendon** then told **Trammel** that **Smith** was going to bring him 12 and he needed to take two of those to **Teresa**'s, and he (**McClendon**) gave **Trammel** directions to **Teresa**'s (**Teresa Chagolla**) residence.

7.     In your Affiant's opinion, this audio call was in reference to **Smith** having 14 1/2 ounces of methamphetamine at her residence, and she was supposed to take 12 ounces of it to **Donald Trammel**. As this call was being intercepted, your Affiant contacted Muskogee Police Sgt. William Peters, who was on duty that day. Sgt. Peters went to the area of **Smith**'s residence. Sgt. Peters stopped **Smith** for failure to come to a complete stop at a stop sign. During the course of the traffic stop, Sgt. Peters had his police K-9 conduct an open air sniff of **Smith**'s vehicle. The K-9 alerted to the odor of narcotics coming from in and around the vehicle. During a search of the vehicle, approximately 12 ounces of a white crystal like substance that field tested positive for methamphetamine was recovered from inside the vehicle.   After **Smith** was arrested, **McClendon** directed Regina Hummingbird to go to **Smith**'s residence to get the remaining methamphetamine and take it to **Donald Trammel**.  Your affiant was on surveillance, and after Hummingbird and another female, who was identified as Matilda Hummingbird, left **Smith**'s residence, they were also stopped by law enforcement. During the course of the traffic stop, Sgt. Peters had his police K-9 conduct an open air sniff of the vehicle Hummingbird and Birdtail were stopped in. The K-9 alerted to the presence and odor of narcotics coming from in and around the vehicle. During a search, approximately two ounces of a white crystal like substance

that field tested positive for methamphetamine were recovered from Hummingbird and Birdtail located on their person.

## I.    Teresa Chagolla

### 1.    Identification of Teresa Chagolla

a.    In an interview with **Amber Claphan**, she told your affiant she had picked up money from **Teresa Chagolla** that she (**Claphan**) took the money to Oklahoma City, Oklahoma, for the purchase of methamphetamine. **Claphan** identified a photograph of **Teresa Chagolla** as the person she knew as **Teresa**.

b.    During the wire intercept, communications were intercepted between **McClendon** and cellular phone number (918) 931-2461. The user of the phone had a female voice that identified herself as "Teresa".

c.    On January 6, 2015, your affiant and TFO Tim Turner conducted a knock and talk interview at 19594 Park Hill Rd, Tahlequah, Oklahoma. Your affiant made contact with a female subject who identified herself as **Teresa Chagolla** and said her cellular phone number was (918) 931-2461. As your affiant spoke with **Chagolla**, I recognized her voice to be the same one that was captured on the intercepted audio calls for that cellular phone number and who identified herself as "Teresa". While I spoke with **Chagolla**, she received an incoming phone call from (918) 351-9356, which is the cellular phone number that **McClendon** changed his phone number to during the wire intercept. **Chagolla** answered the phone and spoke to someone. When **Chagolla** hung up, I asked her who she was speaking to. She said she only knew the person as "Brother". **Chagolla** also gave your Affiant consent to search her residence. During the search, electronic scales, plastic bags and approximately $530 U.S. currency was located in **Chagolla**'s bedroom. While looking in the kitchen, your Affiant observed empty plastic zip lock storage

bags that were wrapped up inside a larger zip lock bag in the trash. Your Affiant knows those types of large freezer bags to be used as packaging devices for methamphetamine.

**J.    Interception of Teresa Chagolla**

Listed below are some of the intercepted communications with **Teresa Chagolla**:

**Session 2537 on November 30, 2015 at 1141 hours. Incoming call between McClendon and Teresa Chagolla.**

1.    The following is a brief synopsis of the call: **Chagolla** told **McClendon** she had $3,350. **McClendon** told her he was going to call the Muskogee County Jail to determine the bond amount for Bryan Lavor. **McClendon** asked **Chagolla** how many she had, and **Chagolla** said she has "three". **Chagolla** hung up, and **McClendon** called the Muskogee County Jail.

2.    In your Affiant's opinion, this call was in reference to **McClendon** trying to get money to post a bond for a Bryan LaFavor who had been arrested after he was stopped on a traffic stop by the Muskogee Police Department and was found to be in possession of three ounces of methamphetamine. When **Chagolla** said she had three, your Affiant believed **Chagolla** was telling **McClendon** she had three ounces left.

**Sessions 1781 and 1782 on November 28, 2015 at 1810 hours. SMS text messages from McClendon to Teresa Chagolla.**

3.    **McClendon:** *"Don b by in twenty sis.."*

   **McClendon:** *"Dropping off six things"*

4.    In your Affiant's opinion, the text messages are in reference to **Donald Trammel** going to **Chagolla**'s residence to drop off six ounces of methamphetamine. During the wire intercept, ounces were oftentimes referred to as "things" so when **McClendon** said "six things" your Affiant believed **Trammel** will be dropping off six ounces.

**K.    Jacob Masters**

1.    **Identification of Jacob Masters**

a.    In an interview with **Amber Claphan**, she told your Affiant that in December of 2015 she had gone to Oklahoma City, Oklahoma, to pick up at least one pound of methamphetamine for **McClendon**. **Claphan** said she made the trip with a male subject she knew to be **McClendon**'s Uncle. Your Affiant showed **Claphan** a photograph of **Jacob Masters**. **Claphan** identified the photograph as the person she knew to be **McClendon**'s uncle and the person with whom she made the December 2015 trip to Oklahoma City.

b.    During the wire intercept, there were intercepted communications between **McClendon** and cellular phone number (918) 506-1159. The user of the cellular phone number had a male voice that **McClendon** would call his "Uncle".

c.    On December 11, 2015, there was an intercepted audio call where the user of (918) 506-1159 was directed by **McClendon** to go to **Teresa Chagolla**'s residence to pick up three ounces of methamphetamine. On December 11, 2015, surveillance observed a red Chevy S-10 truck with an Oklahoma Tag travel to **Chagolla**'s residence at 19594 Park Hill Rd, Tahlequah, Oklahoma.  When the truck left the residence, it was stopped on a traffic stop by the Tahlequah Police Department for making an improper lane change and turn. When the officer made contact with **Masters**, the officer observed in plain view a white substance that he believed to be methamphetamine.  The substance weighed approximately three ounces and field tested positive for methamphetamine.  The driver of the truck, who was the subject observed going inside **Chagolla**'s residence, was identified as **Jacob Masters**.

L.    **Interception of Jacob Masters**

1.    Listed below are some of the intercepted communications between **McClendon** and **Masters**:

**Session 4525 on December 4, 2015 at 1400 hours. Incoming call between Jacob Masters, McClendon, and Ashley Steele.**

2.    The following is a brief synopsis of the call: This was a three-way phone call between **Jacob Masters**, **McClendon** and Ashley Steele. During the call, Steele advised she was at **Teresa Chagolla**'s residence and gave **McClendon** directions to it. **McClendon** told Steele

37

that Uncle was going to come by to drop some money off and pick up two of those. **McClendon** asked Steele what **Teresa** was doing, and Steele said she was just sitting there.

3.    In your Affiant's opinion, this is an audio communication where Steele gave directions to **Chagolla**'s residence so **Masters** could come by to drop off some money and pick up two ounces of methamphetamine.

**Session 5738 on December 6, 2015 at 1314 hours. Incoming call between McClendon and Jacob Masters.**

4.    The following is a brief synopsis of the call: **Masters** told **McClendon** he picked up "one and a half" from her and gave her that $1,500 and asked if they are even now. **McClendon** told **Masters** he was still down a little bit. **Masters** told **McClendon** he has a 1987 Chevy S-10 he wanted to sell for $1,800 if anyone wanted it.

5.    In your Affiant's opinion, this audio communication was in reference to **Masters** picking up one and half ounces of methamphetamine from a co-conspirator and dropping off $1,500 for it. **Masters** wanted to know if he still owed **McClendon** any money, and **McClendon** told him he owed a little bit. The reference to the 1987 Chevy S-10 further identified **Masters** as that was the truck he was stopped on a traffic stop in by the Tahlequah Police Department on December 11, 2015.

**Session 8466 on December 11, 2015 at 1026 hours. Incoming audio call between McClendon, Jacob Masters, and Ashley Steele.**

6.    The following is a brief synopsis of the call: **Masters** asked **McClendon** if he could get some more (methamphetamine). **McClendon** said he could get three, and **Masters** told **McClendon** he would call when he headed that way. **McClendon** then called a co-conspirator who has been identified as Ashley Steele and told her to go to **Teresa**'s residence to get three

zips to give to uncle. **McClendon** told Steele there should be plenty over there, and Steele agreed and said there was.

7.    In your Affiant's opinion, this communication was in reference to **Masters** going to **Teresa Chagolla**'s residence located at 19594 Park Hill Rd. Tahlequah, Oklahoma, on December 11, 2015, to pick up three ounces of methamphetamine. On December 11, 2015, surveillance watched as a red Chevy S-10 truck went to **Chagolla**'s residence. When the truck left **Chagolla**'s residence, the vehicle was stopped by the Tahlequah Police Department. When the officer made contact with **Masters**, the officer observed in plain view a white substance that he believed to be methamphetamine.   The driver of the truck, who was identified by law enforcement as **Jacob Masters**, was found to be in possession of more than three ounces of a substance that field tested positive for methamphetamine located on the floorboard of the vehicle.

## M.    Nathan Green

### 1.    Identification of Nathan Green

a.    During the wire intercept there were intercepted communications between **McClendon** and the cellular phone number of (918) 708-2103. The user of the cellular phone had a male voice and was called Tattoo or **Nathan**.

b.    During the wire intercept surveillance, observed a white 1997 Ford F-150 in the driveway of **Teresa Chagolla**'s residence with Oklahoma License Number 323-HQM. The registration showed the truck to be owned by a **Nathan Green**.

c.    On December 8, 2015, an unidentified co-conspirator contacted **McClendon** about traveling to the Reasor's in Tahlequah, Oklahoma, and wanted to meet someone to purchase an ounce of methamphetamine for $650. **McClendon** called **Teresa**

39

**Chagolla** about the purchase, and she said she would send "Tattoo". Surveillance watched as that white Ford F-150 met with someone in the parking lot of a Reasor's grocery store in Tahlequah, Oklahoma.

d.     In your Affiant's opinion, on December 8, 2015, Tattoo was sent to Tulsa, Oklahoma, at the direction of **McClendon**, to pick up two pounds of methamphetamine. Surveillance watched as the truck drove from Tahlequah, Oklahoma, within the Eastern District of Oklahoma, and traveled to 731 N. Atlanta Ave., Tulsa, Oklahoma. Intercepted communications revealed that **Green** was obtaining two pounds of methamphetamine at the Tulsa residence. When the truck left the Tulsa residence it was stopped by the Tulsa Police Department. During the course of the stop, a K-9 conducted an open air sniff of the truck. The K-9 indicated to the odor of narcotics coming from in and around the vehicle. During a search of the vehicle, approximately 2 pounds of a substance that field tested positive for methamphetamine was recovered. The male subject, who was the only occupant in the truck, was identified as **Nathan Green**. On the Tulsa Police Department arrest report for **Green**, the phone number of (918) 708-2103 was listed as his cellular phone number.

**N.     Intercepted Communications with Nathan Green**

1.     Listed below are some of the intercepted communications involving **Nathan Green**:

**Sessions 10826, 10844, 10855, 10856, 10864, 10870, 10879, 10912, 10919, 10951, 10962, 10966, 10968, 10977, 10994, 11019, 11032 on December 14, 2015. Incoming/Outgoing calls between McClendon and Nathan Green**

2.     During these intercepted communications between **McClendon** and **Green**, **McClendon** directed **Green** to go to Tulsa with **Donald Trammel** to pick up two pounds of methamphetamine. In communications between **Green** and **McClendon**, and then **Trammel** and

40

**McClendon**, they agreed to take two vehicles and then **Green** would pick up the methamphetamine. After picking up the methamphetamine, **Green** was supposed to meet **Trammel** at 71st and Lewis, Tulsa, Oklahoma, and drive back to Tahlequah, Oklahoma. On December 14, 2015, surveillance watched as the white Ford F-150 truck, that was later found to be driven by **Green** drove from Tahlequah to Tulsa, Oklahoma. A silver Ford Fusion with Cherokee Nation Tag, License Number 968-28C that is registered to **Donald Trammel** was observed by your Affiant, who was on surveillance, following the Ford F-150 that was driven by **Green** on the Muskogee Turnpike towards Tulsa, Oklahoma. When they arrived in Tulsa, **Green** was directed by **McClendon** on an intercepted call to go to 731 N. Atlanta Ave., Tulsa, Oklahoma, to pick up the methamphetamine and **Trammel** went to another location to wait for **Green**. After **Green** left the residence on Atlanta Ave., Tulsa, Oklahoma, law enforcement conducted a traffic stop and approximately two pounds of a substance that field tested positive for methamphetamine was recovered.

## IV. <u>CONCLUSION</u>

Based on the above facts, your Affiant believes that probable cause has been shown to believe that **Cody McClendon, Michael Lincoln, Amber Claphan, Donald Trammel, Samantha Smith, Teresa Chagolla** and **Nathan Green** did commit the following: Drug Conspiracy in violation of 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A). Based on this information, the undersigned prays that this Honorable Court issue a finding of fact that probable cause exists to believe that a crime has been committed in the Eastern District of

Oklahoma and that there is probable cause to believe the above named defendants committed that crime.

_____
Affiant, John Morrison
Oklahoma Bureau of Narcotics

Subscribed and sworn to before me this _25th_ day of January, 2016

_____
KIMBERLY E. WEST
United States Magistrate Judge